ORIGINAL

AO 93 (Rev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   17-MJ-02337 |
| | ) |
| 1839 E. 63rd Street | ) |
| Long Beach, California 90805 | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.   Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before ____14 days from the date of its issuance____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   2:44 pm. September 19, 2017

_Judge's signature_

City and state:   Los Angeles, California        KAREN L. STEVENSON, U.S. Magistrate Judge
_Printed name and title_

AUSA:  Joshua O. Mausner

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| *Case No.:*<br>17-MJ-02337 | *Date and time warrant executed:*<br>9/22/17    6:10Am | *Copy of warrant and inventory left with:*<br>Eminic  Aldaco |

*Inventory made in the presence of :*

Eminic  Aldaco

*Inventory of the property taken and name of any person(s) seized:*

[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

Samsung cell phone  A3L5GHTS99
LG cell phone  35519706126151Z (black)
Samsung cell phoe (grey)
Dell Computer Inspiron 3646

---

**Certification**  (by officer present during the execution of the warrant)

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.*

*Date:* 10/16/17

_____
*Executing officer's signature*

Timsthy Alon  Specal Aget
*Printed name and title*

AUSA:  Joshua O. Mausner

**ATTACHMENT A**

PREMISES TO BE SEARCHED

The premises is located at 1839 E 63rd Street, Long Beach, California 90805 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is located on the north side of E 63rd Street, which is located between Cherry Avenue to the east and Rose Avenue to the west. The SUBJECT PREMISES is located in a single-story building containing units "1839" and "1839 ½." These two units share a common walkway with two units from an adjacent building containing units "1837" and "1837 ½." All of the units are clearly marked with black numbers on the common walkway behind a black wrought iron fence.

The building containing the SUBJECT PREMISES is tan in color. The front door and window trims are white, and the roof is black. The driveway has a sliding black wrought iron gate adjacent to the sidewalk. The driveway runs to the rear of the premises to a building containing garages. The garage has the same color scheme as the residential building.

The SUBJECT PREMISES includes the entire property located at 1839 E 63rd Street, Long Beach, California 90805, including but not limited to any vehicles, parking spaces, garages, storage spaces, and appurtenances.



Subject Premises
1839 E 63rd St, Long Beach



**Instrumentality Protocol**

## **ATTACHMENT B**

I.      ITEMS TO BE SEIZED

1.      The items to be seized are evidence, contraband, fruits, or instrumentalities of

violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and

2252A(a)(5)(B) (possession of child pornography), namely:

a.      Child pornography, as defined in Title 18, United States Code, Section

2256(8).

b.      Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that refer to the possession, receipt, distribution,

transmission, request, trade, transaction, advertisement, production, and/or reproduction of child

pornography, as defined in Title 18, United States Code, Section 2256(8).

c.      Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that relate to the viewing, sharing, purchasing,

advertisement, or downloading of child pornography, as defined in Title 18, United States Code,

Section 2256(8).

d.      Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that refer or relate to any production, receipt, shipment,

order, request, trade, purchase, advertisement, or transaction of any kind involving the

transmission through interstate commerce by any means, including by computer, of any visual

depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States

Code, Section 2256.

e.      Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, tending to identify persons involved in the possession,

receipt, distribution, advertisement, transmission, reproduction, viewing, sharing, purchase,

downloading, production, shipment, ordering, requesting, trading or any transaction of any kind, in interstate commerce, including by computer, involving any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(B).

f.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

g.      Any records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

h.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to Kik Messenger.

i.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

j.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

k.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital devices found inside the SUBJECT PREMISES.

l.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

m.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.    evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

       vii.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

       viii.  records of or information about Internet Protocol addresses used by the device;

       ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

  3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.     SEARCH PROCEDURE FOR DIGITAL DEVICES

4.     In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court..

b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.     The team searching the digital data also may use sophisticated tools, such as forensic hashing tools, to identify child pornography (including, but not limited to, "Encase" and "Forensic Tool Kit," or "FTK"). Forensic hashing is the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data

**Instrumentality Protocol**

(such as a particular file). If the data is changed, even very slightly (such as the addition or deletion of a comma or a period), the identifier should change. A hash value can be thought of as a "digital fingerprint" for data. The team searching digital devices in this case will also use a "hash set," which contains the hash values of image and video files associated with known identified victims of child pornography to determine whether these files are stored within a digital device. Because this "hash set" is constantly being updated as investigations result in the rescue of children depicted in child pornography images/videos, it will not contain the hash values of all currently identified image and video files. The team searching the digital devices will only use search protocols specifically selected to identify items to be seized under this warrant.

      c.    When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

      d.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      e.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    **Instrumentality Protocol**

f.       If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.       If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

h.       The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

i.       Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.       In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.       Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.       Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

   c.  Any magnetic, electronic, or optical storage device capable of storing

digital data;

   d.  Any documentation, operating logs, or reference manuals regarding the

operation of the digital device or software used in the digital device;

   e.  Any applications, utility programs, compilers, interpreters, or other

software used to facilitate direct or indirect communication with the digital device;

   f.  Any physical keys, encryption devices, dongles, or similar physical items

that are necessary to gain access to the digital device or data stored on the digital device; and

   g.  Any passwords, password files, test keys, encryption codes, or other

information necessary to access the digital device or data stored on the digital device.

   6.  The special procedures relating to digital devices found in this warrant govern

only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Timothy Alon, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 1995. My responsibilities with the FBI include investigations into the sexual exploitation of children and child pornography in the Central District of California. The FBI is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under 18 U.S.C. § 2251 et seq. During my tenure with the FBI, I have conducted and participated in numerous investigations of criminal activity, including at least 300 investigations in which targets have exploited children, typically by transmitting child pornography using computers connected to the Internet. During my investigations in these cases, I have participated in the execution of at least 300 search warrants in which evidence of these violations was seized. I am currently assigned to the Child Exploitation Investigations Group ("CEIG"), which is a task force specifically dedicated to investigating and combating child exploitation. The CEIG task force is operated by the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI").

2.      Through my training and experience, I have become familiar with the methods of operation used by people who are involved with offenses involving the sexual exploitation of children. I have attended training classes and seminars concerning computer crimes and the sexual exploitation of children on the Internet. This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses. My experience in investigations in this regard has supplemented my understanding of how people involved in offenses relating to the sexual exploitation of children use the Internet to further those offenses.

## II.  PURPOSE OF AFFIDAVIT

3.      This affidavit is made in support of an application for a warrant to search the premises located at 1839 E 63rd Street, Long Beach, California 90805 (the "SUBJECT PREMISES"), more fully described in Attachment A, which is attached hereto and incorporated herein by reference, and to seize evidence, fruits, and instrumentalities, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography).

4.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.  SUMMARY OF INVESTIGATION

5.      As set forth in greater detail below, in January 2017, the FBI in Charlotte, North Carolina ("FBI Charlotte") executed a federal search warrant at the residence of Justin Cole Milam to search for evidence of child pornography.  Agents learned that Milam had utilized the Kik Messenger chat application ("Kik") to trade child pornography with other Kik users.  One of those Kik users was an account with the username "Potc12345."  A series of child pornography files were traded between Milam and Potc12345 between December 26, 2016, and December 27, 2016.  The IP address used to create the Potc12345 Kik account, and that has most often been used to access the Potc12345 account, is assigned to the SUBJECT PREMISES.

2

**Instrumentality Protocol**

## IV.  DEFINITION OF TERMS

6.    The following terms have the indicated meaning in this affidavit:

a.    The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in Title 18, United States Code, Section 2256.

b.    The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

c.    The term "email" (electronic mail) is defined as the messages sent from one person to another via a computer. Email may also include files sent as attachments to or embedded within text messages. Email can also be sent automatically to a large number of addresses via a mailing list.

d.    The term "Internet" is defined as the worldwide network of computers—a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of computer networks, online services, and single user components. In order to access the Internet, an individual computer or digital device user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.    The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based. IP allows a packet of information to travel through multiple networks (groups of linked computers) on the way to its ultimate destination.

f.    The term "IP Address" is defined as a unique number assigned to each computer or digital device directly connected to the Internet. Each computer or device connected to the Internet is assigned a unique IP address while it is connected (for example,

3

**Instrumentality Protocol**

172.191.142.150).  The IP address for a user may be relatively static, meaning it is assigned to

the same subscriber for long periods of time, or dynamic, meaning that the IP address is only

assigned for the duration of that online session.

        g.      The term "Internet Service Provider" ("ISP") is defined as a business that

allows a user to dial into or link through its computers thereby allowing the user to connect to the

Internet for a fee.  ISPs generally provide only an Internet connection, an electronic mail address,

and maybe Internet browsing software.  A user can also connect to the Internet through a

commercial online service such as AT&T, Verizon, or Time Warner Cable.  With this kind of

connection, the user gets Internet access and the proprietary features offered by the online

service, such as chat rooms and searchable databases.

        h.      The term "Cloud Storage" is defined as a network of online storage where

data is saved in virtual storage that is hosted by third parties.  The hosting companies operate

large data centers, possibly across multiple servers.  Cloud storage allows users to save files and

data online and access their information from anywhere using any digital device with an Internet

connection.

        i.      The terms "jpeg," "jpg," "gif," "bmp," and "art" are defined as graphic

image files, namely, pictures.

        j.      The terms "mpeg," "mpg," "mov," "avi," "rm," and "wmv" are defined as

video or movie files.  To use these video files, one needs a personal computer or other digital

device with sufficient processor speed, internal memory, and hard disk space to handle and play

typically large video files.  One also needs a video file viewer or client software that plays video

files.  One can download shareware or commercial video players from numerous sites on the

Internet.

4

**Instrumentality Protocol**

## V.   BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND THE USE OF KIK AS A MEANS FOR SHARING CHILD PORNOGRAPHY

7.      Based upon my training and experience in the investigation of child pornography and with peer-to-peer file sharing programs, and information related to me by other law enforcement officers involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography.

8.      Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

9.      Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently transfer files from one location to another, or from one digital or storage device to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer and digital device users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced, transported, and stored. For example, with the click of a button, someone trading images and videos containing child pornography with others through an online instant messaging application can copy and transfer the images and videos onto other digital devices or media storage devices such as external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied

5

**Instrumentality Protocol**

onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

10.     Kik Messenger, also known as "Kik," is a popular free instant messenger application for mobile devices (i.e., smart phones, tablets, iPods, etc.) from the Canadian-based Kik Interactive, which was founded in 2009. According to Kik Interactive, Kik Messenger has approximately 300 million registered users, and is used by approximately 40 percent of United States teenagers. Kik is available on several mobile device platforms, including iOS, Android, and Windows Phone operating systems. The Kik application utilizes the internet connection through the mobile devices' cellular data plan or through Wi-Fi to send and receive messages, photos, videos, sketches, mobile webpages, and other content transmitted by users through the Kik application.

11.     Kik allows its users to register a user account without providing a telephone number, and prevents users from being located on the service through any information other than their chosen, unique Kik username.[1] At the completion of the account registration, the user is allowed to start communicating with other Kik users. Searching for specific Kik users can only be performed using a Kik user's registered username; searches by phone number or email

---

[1] During the "Sign Up" process, a new user is asked for his/her name and birthday, which is not required to be provided to create an account. When provided, this information is not verified by Kik and can be entirely fictitious. Additionally, a new user is asked for an email address that Kik attempts to verify by sending an email to that address with a link for the user to click on to verify that the email address is valid. However, verifying the address is not required to activate and use an account, and therefore, may also be fictitious.

6

address cannot be performed.  Entering the unique Kik username through the application's

search field yields potential matches with which the user can select to start communicating.

12.     Based on my training and experience, I know that chat applications are often used

to communicate with others, including during the commission of crimes.  In particular, I know

that Kik has become a chat application popular with individuals who have a sexual interest in

children and images of children to discuss their interest with other like-minded individuals,

including to share images and videos of child pornography.

## VI.  STATEMENT OF PROBABLE CAUSE

### A.     Information Provided By FBI Charlotte About Kik User Potc12345

13.     On or about May 4, 2017, I received information about Kik user Potc12345 from

Task Force Officer ("TFO") Thomas J. Ouellette of FBI Charlotte.  From my review of that

information, I learned the following:

a.     FBI Charlotte has been conducting an investigation into child exploitation

violations relating to the use of Kik.  During the course of their investigation, in January 2017,

agents with FBI Charlotte executed a federal search warrant at the residence of Justin Cole

Milam ("Milam"), who had utilized the Kik application on his iPhone to trade child pornography

with other Kik users.  A review of Milam's iPhone found over 130 Kik users with whom he had

traded child pornography.  Approximately 51 of these Kik accounts were identified as located in

the United States.  Milam admitted that he used Kik to trade child pornography with other users.

One of the Kik accounts Milam traded child pornography with was Potc12345.

b.     On or about June 19, 2017, I reviewed Kik messages and images that were

traded between Potc12345 and Milam between on or about December 9, 2016, and January 10,

2017.  These messages were provided to me by TFO Ouellette, who video-recorded as he

scrolled through messages and images that were saved on the Kik application on Milam's phone.

7

**Instrumentality Protocol**

The approximate times reflected in the below descriptions of texts and images sent indicate the point in which the messages and images appeared on TFO Ouellette's recording.

        c.      The following messages and image traded between Milam and Potc12345 occurred on or about December 26, 2016:

        i.      00:06 – Milam sent Potc12345 a message stating, "Yes, but don't know what we traded." Potc12345 responded, "Young Girls" and sent Potc12345 an image that appears to depict a nude female under 13 years old with her legs spread, exposing her genitals.

        d.      The following messages and images traded between Milam and Potc12345 occurred on or about December 27, 2016:

        i.      01:25 – Milam sent Potc12345 an image that appears to depict a minor female under 13 years old laying nude on the ground with a blindfold on. Her ankles and wrists are bound by black straps. Her arms and legs are spread, exposing her genitals.

        ii.      01:44 – Milam sent Potc12345 an image that appears to depict two nude minor children, one female and one male, both under 13 years old. The girl appears to be performing oral sex on the boy. After receiving the image, Potc12345 replied, "nice."

        iii.      01:48 – Potc12345 sent two images to Milam. The first image appears to depict a minor female under 13 years old laying on a bed with her legs spread. Her clothing has been shifted to expose her genitals. The second image appears to depict a minor female, under 18 years old, rubbing her genitals with her fingers.

        iv.      01:52 – Milam sent two images to Potc12345. The first image appears to depict a nude minor female under 10 years old with an erect penis near her mouth. The erect penis appears to belong to a minor. The second image appears to depict a minor

8

**Instrumentality Protocol**

female, approximately 13 years old, with her head resting on another minor female's buttocks.
The buttocks are spread, exposing the other girl's genitals.

              v.      02:04 – Milam sent an image to Potc12345.  The image appears to
depict a nude minor female under 10 years old performing oral sex on an adult male.  She is
sitting down with her legs spread, exposing her genitals.

              vi.     02:13 – Milam sent an image to Potc12345.  The image appears to
depict two minor females laying nude.  One of the minor females, who appears to be under 13
years old, has her legs spread, exposing her genitals.

              vii.    02:54 – Potc12345 requested Milam to "Send 4 boy pics."  Milam
sent four images to Potc12345.  The first image appears to depict a boy under 13 years old on his
back with and his hips thrust into the air.  His erect penis is visible.  The second image appears to
depict a minor male under 13 years old sitting between two minor females, both under 13 years
old.  Both girls appear to be touching his erect penis.  The third image appears to depict a minor
male under 13 years old laying nude on a bed with his legs spread and his penis visible.  The
fourth image appears to depict a minor male under 13 years old performing oral sex on an erect
penis.

              viii.   03:05 – Potc12345 sent a text to Milam which said, "7 pics
heading ur way."  Potc12345 then sent 7 images to Milam.  Several of the images appeared to be
child pornography, including an image that appears to depict a minor female, under 10 years old,
holding what appears to be an adult penis in her hands.

              ix.     03:16 – Milam sent Potc12345 an image that appears to depict a
minor male under 13 years old sitting on a chair with his legs spread and his erect penis visible.

**Instrumentality Protocol**

          x.     03:44 – Milam sent Potc12345 an image that appears to depict a

minor male under 13 years old laying on his back, touching his erect penis.

**B.    Identification of the Subject Premises**

14.    On or about June 19, 2017, I reviewed information provided by Kik Interactive in

response to an administrative subpoena served by FBI Charlotte, requesting subscriber

information for the Potc12345 account. On or about February 22, 2017, Kik Interactive provided

FBI Charlotte the following registration information for Potc12345:

| | |
|---|---|
| First Name: | edward |
| Last Name: | kenway |
| Email: | qerminia@gmail.com (unconfirmed)[2] |
| Device: | LGMS395 (MetroPCS)[3] |
| Date: | August 13, 2016 |
| IP Address: | 66.214.228.105 (the "SUSPECT IP ADDRESS") |

15.    The information provided by Kik Interactive also showed the login dates, times,

and IP addresses used by Potc12345. According to information provided by Kik, Potc12345

logged into Kik approximately 4,868 times between on or about January 23, 2017, and February

---

    [2] As discussed above, Kik does not verify the information a new user provides while
registering for an account, including whether the user provides a verified email address. A
"confirmed" email address means that the user received a verification email from Kik and
clicked on the link to verify that the email was valid. In this instance, an "unconfirmed" email
address means that the user did not click on the verification link to confirm the validity of the
email address.

    [3] I know from querying publicly available information on the internet that LGMS395
refers to an LG smart phone on the MetroPCS network. The smart phone is a discontinued
model that was also called the Optimus F60.

**Instrumentality Protocol**

22, 2017.[4]  Of the 4,868 total logins during this time period, 4,339 were connected to Kik using the SUSPECT IP ADDRESS, the same IP address used to create the account on August 13, 2016.  The SUSPECT IP ADDRESS was by far the IP address most commonly used by Potc12345 to log on to Kik during this time period.[5]

16.     The SUSPECT IP ADDRESS is registered to ISP Charter Communications. According to Charter Communications, between November 28, 2015, and March 13, 2017, the SUSPECT IP ADDRESS was continuously assigned to Salvador JIMENEZ at the SUBJECT PREMISES.

17.     On or about June 21, 2017, I reviewed a National Comprehensive Report ("NCR")[6] records check for Salvador JIMENEZ.  I learned that JIMENEZ's most recent address was the SUBJECT PREMISES.  I also learned that the Social Security Number associated with JIMENEZ was also associated with the names Salvador Lozano-Jimenez and Salvador Lozano.

18.     On or about July 6, 2017, Long Beach Police Department ("LBPD") Detective Jerry Poole advised me that LBPD Detective Joe Pirooz confirmed with the United States Postal Service that, as of July 6, 2017, Salvador JIMENEZ was receiving mail at the SUBJECT PREMISES.

---

[4] Because of Kik's data retention policy, I was only able to obtain records going back 30 days from the date of the response to the subpoena.  Kik was unable to provide records from the December 2016 time period, when the child pornography discussed above was being traded.

[5] During the same time period, approximately 54 Kik logins were conducted using an IP address assigned to Georgia Coin Laundry, located at 8123 Alondra Boulevard, Paramount, California, which is located approximately 2.2 miles from the SUBJECT PREMISES.  The logins utilizing this IP address all occurred on Saturdays.  Additionally, during the same time period, 475 logins were conducted using numerous IP addresses registered to cellular service provider T-Mobile.  T-Mobile was unable to determine the subscriber for the IP addresses, dates, and times Potc12345 was connected to Kik using the T-Mobile-assigned mobile IP addresses.

[6] NCR is a report generated by Thomson Reuters, which consolidates public records, including addresses, driver licenses, property deed transfers, and corporate information, as well as other records.

11

**Instrumentality Protocol**

19.     On or about August 8, 2017, I reviewed a Charter Communications document showing that, as of August 8, 2017, the SUSPECT IP ADDRESS was still registered to Salvador JIMENEZ at the SUBJECT PREMISES.

20.     Based on my training and experience, I believe there is probable cause to believe that in December 2016, Salvador JIMENEZ or someone who resides at the SUBJECT PREMISES distributed, received, and possessed child pornography.  Accordingly, I believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography)  will be found at the SUBJECT PREMISES.

## VII. TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN

21.     Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that there are certain characteristics common to individuals with a sexual interest in children and images of children:

a.     Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, in person, in photographs, or in other visual media; or from literature describing such activity.

b.     Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  This includes collecting images or videos traded with other like-minded individuals through online messaging applications such as Kik.  Individuals who have a sexual interest in children or images of children oftentimes transfer, maintain, and store such materials,

12

**Instrumentality Protocol**

and use them for their own sexual arousal and gratification. Further, they may use these
materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected
child partner, or to demonstrate the desired sexual acts.

c.    Individuals who have a sexual interest in children or images of children
sometimes possess hard copies of child pornography, such as pictures, films, video tapes,
magazines, negatives, photographs, etcetera. As digital technology has developed, individuals
with a sexual interest in children or images of children have become much more likely to
maintain child pornography, including materials they may have obtained from, or shared with,
other individuals through chat and file-sharing applications such as Kik, in digital or electronic
format, stored either on digital devices or in remote storage locations on the Internet. Regardless
of whether these individuals collect their child pornography in hard copy or digital format, they
may maintain their child pornography for a long period of time, even years. They usually
maintain these collections in a safe, secure, and private environment, such as their homes,
vehicles, or nearby, so they can view the child pornography at their leisure. These collections
are typically highly valued.

d.    Individuals who have a sexual interest in children or images of children
also may correspond with and/or meet others to share information and materials; rarely destroy
correspondence from other child pornography distributors/ collectors; may conceal such
correspondence as they do their sexually explicit material; and often maintain lists of names,
addresses, and telephone numbers of individuals with whom they have been in contact and who
share the same interests in child pornography. Additionally, individuals who receive or share
child pornography with other online users often keep backups and copies of those materials on
other digital or storage devices in their homes, cars, or other nearby locations.

13

**Instrumentality Protocol**

e.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

f.      Based on my training and experience, as well as my conversations with digital forensics agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via computer. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Because computer evidence is recoverable after long periods of time, and because there is probable cause to believe that persons at the SUBJECT PREMISES were once

14

**Instrumentality Protocol**

in possession of child pornography and likely obtained it from some as yet unidentified source,

there is probable cause to believe that evidence of activity related to the distribution, receipt, and

possession and distribution of child pornography will be found at the SUBJECT PREMISES.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22.    As used herein, the term "digital device" includes any electronic system or device

capable of storing or processing data in digital form, including central processing units; desktop,

laptop, notebook, and tablet computers; personal digital assistants; wireless communication

devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital

cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral

input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives

intended for removable media; related communications devices, such as modems, routers, cables,

and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical

disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and

security devices. Based on my knowledge, training, and experience, as well as information

related to me by agents and others involved in the forensic examination of digital devices, I

know that data in digital form can be stored on a variety of digital devices and that during the

search of a premises it is not always possible to search digital devices for digital data for a

number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires

specific expertise and specialized equipment. There are so many types of digital devices and

software programs in use today that it is impossible to bring to the search site all of the necessary

technical manuals and specialized equipment necessary to conduct a thorough search. In

addition, it may be necessary to consult with specially trained personnel who have specific

15

expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten

16

**Instrumentality Protocol**

by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

    e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that

17

**Instrumentality Protocol**

show what tasks and processes on the computer were recently used. Web browsers, e-mail

programs, and chat programs often store configuration data on the hard drive that can reveal

information such as online nicknames and passwords. Operating systems can record additional

data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the

times the computer was in use. Computer file systems can record data about the dates files were

created and the sequence in which they were created. This data can be evidence of a crime,

indicate the identity of the user of the digital device, or point toward the existence of evidence in

other locations. Recovery of this data requires specialized tools and a controlled laboratory

environment, and also can require substantial time.

    f.  Further, evidence of how a digital device has been used, what it has been

used for, and who has used it, may be the absence of particular data on a digital device. For

example, to rebut a claim that the owner of a digital device was not responsible for a particular

use because the device was being controlled remotely by malicious software, it may be necessary

to show that malicious software that allows someone else to control the digital device remotely is

not present on the digital device. Evidence of the absence of particular data on a digital device is

not segregable from the digital device. Analysis of the digital device as a whole to demonstrate

the absence of particular data requires specialized tools and a controlled laboratory environment,

and can require substantial time.

    g.  Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames and

extensions. For example, files with the extension ".jpg" often are image files; however, a user

can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text. Digital device users can also attempt to conceal data by using encryption, which

18

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

23.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX.  CONCLUSION

24.    For all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described in Attachment A of this affidavit.

Timothy Alon, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 19 day of September 2017.

HONORABLE
UNITED STATES MAGISTRATE JUDGE

19

Instrumentality Protocol